UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FOREST PARK NATIONAL BANK & TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 10 C 3166 |
| | ) | |
| EDWARD DITCHFIELD, HELEN DITCHFIELD, | ) | Judge Rebecca R. Pallmeyer |
| TRUST NUMBER 12861 (U/T/A DATED | ) | |
| SEPTEMBER 10,1985 WITH FIRST BANK | ) | |
| OF OAK PARK) US BANCORP SUCCESSOR | ) | |
| TRUSTEE, TRUST NUMBER 31081 (U/T/A | ) | |
| DATED OCTOBER 12,1999 WITH | ) | |
| COSMOPOLITAN BANK & TRUST) US | ) | |
| BANCORP SUCCESSOR TRUSTEE, AND | ) | |
| E&H ENTERPRISES, INC., D/B/A RIVER | ) | |
| FOREST CLEANERS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants have operated a dry cleaning business in River Forest, Illinois for almost 35 years. Dry cleaning requires the use of the toxic substance perchloroethylene ("perc"); it is undisputed that the soil beneath Defendants' dry cleaning business is substantially contaminated with perc. Plaintiff Forest Park National Bank ("FPNB") became the owner of a residential property adjacent to Defendants' dry cleaning operation after a 2009 foreclosure. In this lawsuit, FPNB claims that Defendants' mishandling and improper disposal of perc contaminated the soil and groundwater on its residential property. Pursuant to the Resource Conservation and Recovery Act ("RCRA"), FPNB seeks damages, costs, and an injunction requiring Defendants to implement a prompt corrective action plan. FPNB also seeks relief under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"): reimbursement for past response costs as well as a declaratory judgment regarding future response costs. FPNB also brings several common law tort claims, but they are not relevant to this opinion.

The parties have filed cross-motions for summary judgment on the RCRA claims. In

addition, FPNB seeks summary judgment on its CERCLA claims. For the reasons explained herein, the court grants and denies discrete aspects of the parties' motions for summary judgment, but ultimately, both RCRA counts remain for trial. The court grants in full FPNB's motion for summary judgment with respect to its CERCLA claims.

## FACTUAL BACKGROUND

### I. The Operation of River Forest Cleaners

Defendants Edward and Helen Ditchfield purchased the commercial property located at 7601 through 7615 Lake Street in River Forest, Illinois, in 1978.[1] (Defs.' 56.1 ¶¶ 4, 6.) Shortly thereafter, on July 19, 1978, they incorporated E&H Enterprises ("E&H") and named Edward Ditchfield as its president. (Defs.' 56.1 ¶ 3.) Defendants state that E&H "took over" operation of River Forest Cleaners ("RFC"), the dry cleaning operation located at 7613-7615 Lake Street, in 1978, and that it continues to operate RFC to this day. (Defs.' 56.1 ¶¶ 1, 4.) The Ditchfields, on behalf of E&H, managed the daily operations of RFC until July 11, 2002, when they sold all E&H stock to Mkhitar Misakian, who has operated RFC since then. (Defs.' 56.1 ¶ 5; Pl.'s 56.1 ¶ 17.)

The parties dispute the date on which the commercial property at 7613-7615 Lake Street first became the site of a dry cleaning business. In his deposition, Edward Ditchfield stated that the dry cleaning business had been in operation since 1928, but he admitted that his conversations with "[p]eople who have lived in the town" were the only basis for that statement. (E. Ditchfield Dep., Ex. T to Defs.' 56.1, at 108:23-109:1.) His wife Helen's recollection was keener; she stated that the previous owner, a man named Al Saunders, operated a dry cleaning business at that

---

[1]    Attached as Appendix A to this opinion is a map of the relevant properties, illustrating the shared boundary between the FPNB-owned residence at 423 Ashland and the parking lot behind River Forest Cleaners. The map was part of a November 2010 report prepared by Defendants' environmental consultant, Bonestroo (*See* Figure 3, attached to Nov. 2010 FSIR-ROR, Ex. 24 to Pl.'s 56.1 (Oct. 15, 2010)), amended by the court to show the approximate location of the boundary between 423 Ashland and 421 Ashland.

location when they originally purchased the property. (H. Ditchfield Dep., Ex. 8 to Pl.'s 56.1, 26:19-27:9.) FPNB notes that a chain-of-title review of the property where RFC is located shows that the prior owners include a milk company, a grocery store, a radio business, and a roofing business—but not a dry cleaning business. (Pl.'s 56.1 ¶ 11.) Defendants have produced no other evidence substantiating the existence of a dry cleaning business on the RFC lot prior to 1978.

Throughout the operation of RFC, E&H has used dry cleaning solvents containing tetrachloroethylene, also known as perchloroethylene and, more succinctly, as "perc." (Defs.' 56.1 ¶ 7.) Because it is widely used in dry cleaning operations, among other industrial uses, perc has become a common soil and water contaminant. Perc is denser than water and not particularly soluble, so when spilled on a surface, it tends to seep rapidly through fissures into the groundwater below, making cleanup more challenging. Agency for Toxic Substances & Disease Registry ("ATSDR"), U.S. Dep't of Health & Human Servs., "Toxicological Profile for Tetrachloroethylene," 190 (Sept. 1997). Extracting perc from soil and groundwater, though difficult, is often essential given that the synthetic substance is a likely human carcinogen. *Id.* at 55-58. Perc is listed as a category F002 hazardous waste under 40 C.F.R. § 261.31, Subpart D.[2]

A.    The "Transfer Unit" Machine (1978 – 1992)

From 1978 through 1992, Defendants[3] employed a "transfer unit" dry cleaning machine at RFC, referred to as such because it consists of a separate washer and dryer, thereby requiring the

---

[2]    The category "F" waste code section is entitled "Hazardous Waste From Nonspecific Sources." 40 C.F.R. § 261.31. The number following the "F" appears to serve only to identify, rather than rank, the various types of waste within the category. The number is to be used in accordance with various notification, record keeping, and reporting requirements. 40 C.F.R. § 261.30(c).

[3]    U.S. Bancorp, as successor trustee to Trust Numbers 12861 and 31081, is also a named Defendant in this law suit. (Defs.' 56.1 ¶ 6.) The trusts hold legal title to the properties at 7609 – 7615 Lake Street and 7601 – 7607 Lake Street, respectively, and Edward and Helen Ditchfield are the named beneficiaries of both trusts. (Defs.' 56.1 ¶ 6.) The court has previously held U.S. Bancorp to be a nominal Defendant only and excused it from filing any further pleadings. (May 6, 2011 Minute Order [77].)

transfer of clothing mid-cycle. (Defs.' 56.1 ¶ 10.) As Edward Ditchfield explained at his deposition, during the period in which E&H used the "transfer unit" machine, E&H ordered roughly 100 gallons of perc each month from one of two vendors who would deliver the perc and deposit it into the base of the machine.[4] (E. Ditchfield Dep. 24:21-26:1, 57:22-58:1.) During a cleansing, perc was applied to clothing to remove oils and other residues. (E. Ditchfield Dep. 80:1-7.) At the end of the wash cycle, the machine operator was required to open the door to transfer clothing to the dryer, thus allowing vaporized perc to escape into the air. (E. Ditchfield Dep. 54:23-55:3.) At his deposition, Edward admitted that, as E&H ordered roughly 100 gallons of perc per month, and he never incinerated or disposed of any perc, it was fair to estimate that "the very vast majority" of their monthly perc supply "evaporated into the air." (E. Ditchfield Dep. 73:11-75:19, 78:14-19.) RFC maintained a "continuous ventilation" system at all hours of operation comprised of multiple exhaust units and open windows and doors. (E. Ditchfield Dep. 55:20-56:20.) Additionally, the facility was equipped with a "sniffer," or as Edward described it, "ductwork" embedded in the floor that suctioned perc vapors into a "carbon bed" filter. (E. Ditchfield Dep. 58:11-60:9.) The Ditchfields would then apply steam heat to the filter, causing the perc to vaporize. The vaporized perc would then be collected and returned to a tank in the "transfer unit" machine where it could be re-used.

A similar distillation process was occasionally required for the "transfer unit" machine itself. After the cleansing process, a diatom filter in the machine, with a "diatomaceous earth" filtering agent, separated the perc from the waste and then cycled the perc back into the machine for reuse. (Answer ¶ 14; E. Ditchfield Dep. 29:15-20; 32:5-21.) After repeated use, the filtering agent lost its effectiveness and needed to be replaced. (E. Ditchfield Dep. 29:8-30:21.) Edward explained the

---

[4]     According to Defendants, when E&H began operating RFC in 1978, the prior owners had left an empty 250-gallon above-ground storage tank, previously used to store perc, near the south entrance to the property. (Defs.' 56.1 ¶ 8.) Defendants state that they never used the tank and removed it from the property in the early 1980s. (Defs.' 56.1 ¶ 9.) There is no other evidence in the record corroborating the existence of such a tank.

process: he poured the filtering agent down into a still (a distilling apparatus adjoined to the dry

cleaning machine) and indirectly applied steam heat to the still in order to bring the perc contained

therein to a boil, causing it to vaporize. (E. Ditchfield Dep. 33:3-34:14.) The vaporized perc would

then rise to the top of the still where a cold water coil, running around the top of the still, condensed

the vapor back into a liquid, collected the liquid, and routed it back to the base tank where liquid

perc was stored until reintroduced to the machine. (E. Ditchfield Dep. 26:20-23, 37:2-8.) When

the perc was completely vaporized, only the spent filtering agent and an "oily waste" by-product

(the result of the residues removed from clothes) remained at the bottom of the still. (E. Ditchfield

Dep. 79:21-80:17.) In a 1986 "Generator Annual Hazardous Waste Report" that Edward Ditchfield

submitted to the Illinois Environmental Protection Agency ("IEPA"), he estimated that RFC was

disposing of 250 pounds of filtering agent-oily waste mixture ("sludge") on a monthly basis and

predicted that his waste levels would be the same in 1987.[5] (E. Ditchfield Dep. 188:10-189:9,

191:14-192:17; *see also* Generator Annual Hazardous Waste Report, attached to Dec. 15, 2003

Phase I Environmental Site Assessment Report (hereinafter "Phase I Report"), Ex. 21 to Pl.'s 56.1,

at 49.) Edward explained that, after the perc distillation process, the sludge would contain only

"possible remnants" of perc. (E. Ditchfield Dep. 193:2-8.)

The Ditchfields stored the sludge in 55-gallon drums kept up off the ground, on "plastic

reinforced shelving" by the rear entrance to RFC. (E. Ditchfield Dep. 126:18-127:5.) They

contracted two different services to remove and empty the drums; initially, they used Safety Kleen

Corporation, which came on a monthly basis whether the drum was full or not, but they later

switched to AAA Disposal Services, which came as needed. (E. Ditchfield Dep. 69:13-16, 128:15-

20.) During the period E&H used the "transfer unit" machine, Edward recalled, he replaced the

filtering agent on at least a monthly basis and, at times, on a weekly basis, but he had never filled

---

[5]     The record does not appear to contain similar reports from other years.

even one 55-gallon drum with waste before a pick-up. (E. Ditchfield Dep. 131:8-21.)

Edward Ditchfield also explained that, on occasion, E&H disposed of spent filtering agent in the municipal dumpster in the parking lot behind RFC, near the property boundary shared with FPNB's residential property, but only when the waste resulted from a test run of the machine, never when an actual dry cleaning cycle had run. (E. Ditchfield's Dep. 114:13-115:9; *see also* Answer ¶¶ 14, 15.) When the Ditchfields conducted a test run of the machine, they did not clean any clothes, and thus, no oily waste would be deposited in the filter. After a test run, the still was used to vaporize and collect the perc until the filtering agent became a "completely dry" powder. (E. Ditchfield Dep. 121:6-12.) Then, the Ditchfields disposed of the dried filtering agent from the test run in the municipal dumpster, because, according to Edward, it contained, at most, only "minuscule amounts" of perc. (E. Ditchfield Dep. 121:6-14.) Edward testified that E&H always used the 55-gallon drums to dispose of the filtering agent-oily waste mixture after a cleansing because "oily waste would have a greater tendency to hold onto perc" than pure filtering agent. (E. Ditchfield Dep. 123:2-17.)

**B.    The "Dry-to-Dry" Machine (1992 – Present)**

In 1992, the Ditchfields replaced the "transfer unit" machine with a "dry-to-dry" machine which consists of only one unit for both washing and drying. (Defs.' 56.1 ¶ 11.) Defendants state, without citation, that the "dry-to-dry" machine is designed to reduce perc emissions by limiting evaporation (Defs.' 56.1 ¶ 11)[6], and that it includes "a Teraguardian system and a steel secondary containment device" to further reduce the potential for soil contamination.[7] (Defs.' 56.1 ¶ 12; Phase I Report at 7.) As Edward Ditchfield explained in his deposition, the "dry-to-dry" machine

---

[6]    Defendants do cite to their answer to the third amended complaint for this statement, but the answer contains simply the same assertion without citation to another source.

[7]    Defendants do not explain how these mechanisms function or how, specifically, they reduce emissions.

is a "self-contained unit." (E. Ditchfield Dep. 53:19.) In other words, significantly less vaporized perc escapes the machine because the clothes do not have to be moved from a washer to a dryer. (E. Ditchfield Dep. 53:19-55:3.) As a result, Edward estimated that RFC used only 50 gallons of perc per year after switching to the "dry-to-dry" machine—a sizeable reduction from the 100 gallons per month (or 1200 gallons per year) he ordered when using the "transfer unit" machine. (E. Ditchfield Dep. 53:5-13.) He also noted that once E&H switched from the "transfer unit" machine to the "dry-to-dry" machine, one could no longer smell perc when operating the machine. (E. Ditchfield Dep. 64:5-10.) RFC continues to store its waste in 55-gallon drums in the hazardous waste storage area near the south entrance until they are picked up and disposed of. (Answer ¶ 17.)

## II.      Investigation of Contamination at 7601-7615 Lake Street, River Forest, Illinois

In 2001, Defendants hired environmental science consultants[8] at Bonestroo to sample the soil at 7601-7615 Lake Street, River Forest, Illinois ("the Site") and "to provide information regarding potential environmental concerns associated with the Site . . . ."[9] (Defs.' 56.1 ¶ 16; Phase I Report at 1.) From October through December 2001, Bonestroo installed and tested twelve soil boreholes and four monitoring wells on the Site; the results were presented in a December 15, 2003 Focused Site Investigation Report. (Focused Site Investigation Report (hereinafter "FSIR"), Ex. 22 to Pl.'s 56.1, at 1.) Based on those samples, Bonestroo concluded that perc was a "[c]ontaminant[ ] of concern" at the Site; it detected a "groundwater contamination plume" of perc roughly 270 feet long, 90 feet wide, and 10 feet deep. (FSIR at 1, 11.) At the plume's most concentrated point—a patch 30 feet long, 20 feet wide, and 2 feet deep—perc was present at a concentration of 360 parts per million ("ppm"). (FSIR at 11.) Figures attached to the

---

[8]      The record does not indicate what prompted Defendants to take this action.

[9]      Bonestroo, previously known as Northern Environmental and now known as Stantec, will be referred to as "Bonestroo" here.

FSIR show that the patch of high concentration appears near the back of RFC, *i.e.*, near the south entrance. (Figure 5A, attached to FSIR.) The 270-foot length of the plume extends, generally, from west to east with RFC near the west end, at 7613 Lake Street, and Annie's Restaurant near the east end, at 7601 Lake Street. (*Id.*) FPNB's property at 423 Ashland does not appear on these figures, but the figures indicate that the western edge of the plume may creep over RFC's western property line, which it shares, in part, with 423 Ashland. (*Id.*)

In the FSIR, Bonestroo recommended development of a remedial action plan in order to address the plume of contamination. (FSIR at 11.) Bonestroo also concluded that the plume was primarily caused by "releases" from the "former" above-ground storage tank that was located outside the rear (south) door of RFC. (FSIR at 9.) The existence of the above-ground storage tank, however, is dubious. Bonestroo does not explain its basis for believing an above-ground storage tank caused perc releases, nor did it have "[any] information available indicating when or how such releases may have occurred." (FSIR at 9.) Defendants' expert and Bonestroo engineer Michael Butler, stated, "We have a report of a former above-ground storage tank that contained perc in that area" (Butler Dep., Ex. 16 to Pl.'s 56.1, 71:17-19), but he did not explain who "report[ed]" the tank or refer to any other evidence corroborating the existence of the tank. Indeed, the only "report" of any such above-ground storage tank that court finds in the record, is the testimony of Edward Ditchfield. (*See* E. Ditchfield Dep. 180:3-181:16). The FSIR provides other possible explanations of the contamination, though, and states that other "minor releases . . . occurred from the present and former dry cleaning machine area and hazardous waste storage areas." (FSIR at 9.)

At the same time, Bonestroo also issued a Phase I Report, synthesizing its investigation of the site with information it gathered from an October 5, 2001 interview with Edward Ditchfield

and from various public records.[10]   (Phase I Report at 2-3).   The report set forth several

conclusions and recommendations: (1) RFC is registered with the Resource Conservation and

Recovery Information System ("RCRIS") as a "small quantity generator" of hazardous waste;

(2) there were no existing signs of spills or staining either in RFC's building or elsewhere at the

Site; (3) other generators of hazardous waste in the area posed no threat of contamination at the

Site; (4) dry cleaning processes prior to the installation of the "dry-to-dry" machine "may pose a

threat to soil and/or groundwater quality," and "soil boreholes" should be drilled to determine

contamination levels; and (5) underground petroleum storage tanks, evidently from a gas station

that existed at the Site, may also be a source of contamination.[11]   (Phase I Report at 8-9.)

Bonestroo recommended that a "Phase II" investigation also be completed.  (Phase I Report at 9.)

Defendants' efforts to carry out that recommendation did not go smoothly.  In May 2004,

Defendants submitted the FSIR to the IEPA along with an application for the Site Remediation

Program stating that Defendants were ready to prepare a remedial action plan.  (Answer ¶ 21.)

Through the Site Remediation Program, the IEPA provides applicants with guidance and technical

assistance regarding remedial activities and issues "No Further Remediation" ("NFR") letters when

applicants have demonstrated that the environmental conditions at their Site do not present a threat

to environment or human health.  *Voluntary Site Remediation Program Unites A & B*, Illinois

Environmental Protection Agency, epa.state.il.us, http://www.epa.state.il.us/land/more-info-about-

bol.html#Voluntary-Site-Remediation-Program (last visited July 10, 2011). Applicants pay for IEPA

activities pursuant to the program; if successful, the IEPA issues an NFR letter, which releases the

applicant from further liability under the Illinois Environmental Protection Act.  *Id*.  In the

---

[10]     A Remedial Objectives Report was also prepared at roughly the same time (*See* Bonestroo Dep., Ex. 9 to Pl.'s 56.1, 9:19-24; FSIR at 2), but does not appear to be included in the record.

[11]     This is the only reference to a gas station as a prior tenant or to underground storage tanks in the factual record or in the pleadings.

Defendants' case, however, the IEPA rejected their initial application because the IEPA determined that the FSIR inadequately characterized the extent of the contamination. (Answer ¶ 22.) The IEPA ordered Defendants to conduct further investigation. (Answer ¶ 22.) Defendants filed their supplemental report on February 28, 2006, but the IEPA rejected that report as well in May 2006. (Answer ¶ 24.)[12] In August 2007, Defendants filed a second supplemental report. It is not readily apparent from the record whether or how the IEPA responded, but, as explained below, Bonestroo submitted new reports again in 2009.

After a foreclosure in 2009, FPNB took over possession of the residential property at 423 Ashland in River Forest. Soon afterwards, FPNB it hired Effluent Technologies, Inc. ("ETI") to conduct its own environmental assessment on the eastern portion of the property, *i.e.*, the portion of land closest to RFC. (Pl.'s 56.1 ¶ 65; ETI Report, Ex. 25 to Pl.'s 56.1, at 5.) ETI collected soil samples from four boreholes and groundwater samples from two locations. (ETI Report at 8.) Those samples showed "[e]levated concentrations" of perc as high as 33 ppm in the soil and .26 ppm in the groundwater. (ETI Report at 8.) The report noted that this concentration of contamination exceeds the IEPA's "Tier 1 soil remediation objectives" and "Tier 1 Class 2 GW remediation objectives." (ETI Report at 9.) Based on this testing and on review of Bonestroo's prior reports, ETI concluded that "the Site at 423 Ashland has been impacted by chlorinated solvents released by River Forest Cleaners." (ETI Report at 9.) At Bonestroo's Rule 30(b)(6) deposition, Michael Butler confirmed that Bonestroo also conducted a study of the 423 Ashland property in 2009 and that it too found "perc contamination levels above EPA soil remediation objectives." (Bonestroo Dep., Ex. 9 to Pl.'s 56.1, 13:14-21.)

Butler stated, further, that Bonestroo conducted additional investigation at RFC in

---

[12]     Though the parties dispute the nature and content of Defendants' submissions to the IEPA and the IEPA's responses during this time period, neither party attached the actual reports to any of their submissions.

March 2009 and found perc contamination up to concentrations of 940 ppm beneath the floor of RFC. (Bonestroo Dep. 13:22-14:8.) Based on that investigation, Bonestroo submitted a revised Focused Site Investigation Report and Remedial Objectives Report ("FSIR-ROR") to the IEPA in July 2009. (Bonestroo Dep. 14:9-13) Again, however, in September 2009, the IEPA rejected Bonestroo's report and requested further investigation. (Bonestroo Dep. 15:7-12.) The follow-up investigation in November 2009 revealed perc contamination of up to 14,000 ppm in the soil beneath RFC; 800 ppm under Newport Audiology, a business that at the time was adjacent to RFC to the east; and 430 ppm beneath the lot occupied by Annie's Beef Restaurant, to the east of Newport Audiology. (Bonestroo Dep. 15:13-16:14.) Bonestroo submitted another revised report in January 2010, recommending that "all areas above the soil saturation be remediated as required." (Bonestroo Dep. 16:15-17:5.) Yet again, in March 2010, the IEPA rejected the FSIR-ROR and asked for additional investigation in order to further characterize the extent of the contamination. (Bonestroo Dep. 17:6-10.) In response to the IEPA's request, Bonestroo conducted still more testing in September 2010 and found "soil contaminated above perc saturation levels" on the south side of RFC, near the back door. (Bonestroo Dep. 17:17-24.) Bonestroo issued another revised FSIR-ROR in November 2010 which recommended remedial measures be taken inside RFC and Newport Audiology, in the soil near Annie's restaurant, and in the soil near the back door of RFC. (Bonestroo Dep. 18:1-13.) A figure attached to that report, entitled "Estimated Extent of Contamination," shows that contamination had spread from RFC onto 423 Ashland. (Figure 5, attached to Nov. 2010 FSIR-ROR, Ex. 24 to Pl.'s 56.1 (Oct. 12, 2010).) At the time of Butler's deposition—May 11, 2011—Defendants had not yet received a response from the IEPA regarding their most recent FSIR-ROR (Bonestroo Dep. 18:17-22), and the record does not include any subsequent correspondence between Defendants and the IEPA.

### III.   Federal Government Involvement at the Site

Meanwhile, in late 2009, the United States Environmental Protection Agency ("USEPA") began to take interest in the Site. A teacher at St. Luke's, a church and school across the street from RFC, sent a concerned e-mail to the USEPA in November 2009. (ATSDR Report, Ex. Q to Defs.' 56.1, at 1 (Aug. 20, 2010).) In response, the USEPA conducted initial air and sub-slab sampling later that month, the results of which showed trichloroethylene ("TCE") and methylene chloride levels exceeding "long[-]term screening levels"[13] at St. Luke's and at My Gym, a nearby children's gymnasium.[14] (ATSDR Report at 1, 2.) Upon receiving the sampling results, the Agency for Toxic Substances and Disease Registry ("ATSDR"), an agency within the Department of Health and Human Services specializing in the effects of hazardous materials on human health, recommended follow-up investigation. (ATSDR Report at 1.) In February 2010, the USEPA again conducted air and sub-slab sampling at, *inter alia*, My Gym, St. Luke's, and 423 Ashland, with

---

[13]   The screening levels establish acceptable limits for exposure to hazardous materials—concentrations lower than the screening level "are not a health concern for even long-term exposure," while concentrations exceeding the screening levels require further evaluation. (ATSDR Report at 5.) In its report, the ATSDR explained that it applied long-term screening levels at the Site that are "based more on chronic, rather than acute, exposures," because the contamination "ha[d] been on-going for some period of time" and "removal . . . would require an extensive effort." (ATSDR Report at 2.) Based on draft guidelines the EPA issued in November 2002, the ATSDR set the long-term screening levels for this investigation "at a 1 in 100,000 estimated increased ($10^{-5}$) cancer risk." (ATSDR Report at 2; *see also* Office of Solid Waste and Emergency Response, Environmental Protection Agency, "Draft Guidance for Evaluating the Vapor Intrusion to Indoor Air Pathway from Groundwater and Soils" (hereinafter "Subsurface Vapor Intrusion Guidance") (Nov. 2002).) In other words, when the concentration of a particular type of hazardous waste would, based on chronic exposure, lead to an "incremental individual lifetime cancer risk" of 1 in 100,000, then the concentration exceeds the long-term screening limit. (Subsurface Vapor Intrusion Guidance at 9.) So when, for example, the February 2010 perc concentrations levels in indoor air samples taken from My Gym hit .63 ppb, they exceeded the long-term screening limit of .60 ppb as established by the draft guidelines. (ATSDR Report at 5, 6.) That exceedance is why, as explained later, the ATSDR recommended installation of a vapor mitigation system at My Gym.

[14]   According to Defendants' expert, perc breaks down into trichloroethylene over time. (Bonestroo Dep. 122:13-18.). Plaintiff's expert stated that methylene chloride "can be used as a spot remover in dry cleaning." (Clark Dep., Ex. 14 to Pl.'s 56.1, 73:10-13.) In their filings on these motions, the parties generally do not distinguish between different types of contamination.

mixed results. (ATSDR Report at 3.) The subsequent ATSDR report, interpreting the USEPA's test results, concluded that there were "no immediate health concerns for the patrons and personnel of My Gym," but nevertheless recommended installation of a vapor mitigation system because perc and methylene chloride levels in the air "need[ed] to be reduced." (ATSDR Report at 3-4.) Indoor air samples from St. Luke's, by contrast, "did not show any exceedances for residential long-term screening levels." (ATSDR Report at 3.) With respect to the Bank's property at 423 Ashland, the Report stated that sub-slab samples

> showed a residential long[-]term screening level exceedence [sic] for methylene chloride in the subsurface of the building at 212 [parts per billion]. Since the building is currently vacant, there is no completed exposure pathway. However, the building should not be occupied until there is further site characterization to evaluate exposure from potential vapor intrusion.

(ATSDR Report at 3.) Finally, in March 2010, the USEPA also conducted air sampling at Annie's Beef Restaurant at the request of the owner; because the USEPA found contamination levels that "exceeded the commercial screening level," the ATSDR recommended that a vapor mitigation system also be installed at Annie's. (ATSDR Report at 3-4.)

After the ATSDR issued its report and recommendations, the USEPA sent Edward Ditchfield a "general notice of potential liability" informing him of its plans to install the vapor mitigation systems at My Gym and at Annie's. (General Notice of Potential Liability Letter, Ex. H to Defs.' 56.1 (Sept. 1, 2010).) The notice advised Ditchfield that the USEPA considered him to be a potentially responsible party ("PRP"), and encouraged him to negotiate an "administrative consent order" under which he would perform remedial measures at the Site and reimburse the USEPA for past investigative costs. (General Notice at 2.) On October 6, 2010, Ditchfield's attorney, Thomas Yu, and Michael Butler of Bonestroo met with Peter Felitti of the USEPA's regional office in Chicago to discuss the general notice. (Oct. 15 Letter, Ex. I to Defs.' 56.1, at 1.) On October 15, 2010, Yu sent Felitti a letter confirming Ditchfield's commitment to perform certain remedial measures, namely, air sampling and "[i]nstallation of sub-slab depressurization systems"

to reduce levels of vaporized perc—measures estimated to cost roughly $13,000. (Oct. 15, 2010 Letter, Ex. I to Defs.' 56.1, at 1-2.) Yu also requested a waiver, or at least a deferral, of the requirement that the Ditchfields pay the USEPA's past investigation costs, which totaled nearly $150,000, because Edward Ditchfield faced financial hardship based, in part, on the prospect of losing commercial tenants.[15] (Oct. 15, 2010 Letter at 3-5.) Three days later, Felitti sent Yu a letter, approving the work to be performed and stating that the USEPA would be willing to discuss a possible waiver of past costs. (Oct. 18, 2010 Letter, Ex. J to Defs.' 56.1.)

Bonestroo, on behalf of Defendants, oversaw the installation of vapor mitigation systems by an outside contractor at Annie's in December 2010 and at My Gym in March 2011. (Bonestroo Dep. 123:18-124:13.) Then in December 2011, Edward Ditchfield and the USEPA entered into a settlement agreement pursuant to § 122 of CERCLA, 42 U.S.C. 9622, requiring Ditchfield to pay $39,926 to the USEPA in compensation for "Past Response Costs." (Settlement Agreement for Recovery of Past Response Costs (hereinafter "Settlement Agreement"), Ex. G to Defs.' 56.1, ¶¶ 11, 28.) The record does not state whether or when Edward Ditchfield paid the amount owed.

## IV.    FPNB Files Suit Against Defendants

The settlement agreement between Ditchfield and the USEPA did not address the threat of contamination at 423 Ashland. FPNB filed this action on May 21, 2010. A little over a year later, during the process of discovery, FPNB retained expert witness Milton Clark to determine whether the perc contamination levels at the Site, as detected by ETI in 2009, present a threat to health and

---

[15]     According to the deposition testimony of Edward Ditchfield and of FPNB representative John Vainisi, news of the contamination at the Site made it into the local papers. (E. Ditchfield Dep. 101:17-102:14; Vainisi Dep. 40:20-23.) A quick internet search confirms this. *See, e.g.*, Bill Dwyer, EPA to Test St. Luke's for Contamination, Oakpark.com (Nov. 10, 2009 10:05 PM) http://www.oakpark.com/News/Articles/11-10-2009/EPA_to_test_St._Luke's_for_con-tamination; Bill Dwyer, *River Forest Cleaners Contamination Under Lathrop Ave.*, Oakpark.com (Nov. 24, 2009, 10:00 PM) http://www.oakpark.com/News/Articles/11-24-2009/River_Forest_Cleaners_contamination_under_Lathrop_Ave.

environment.  Clark worked for the USEPA for over two decades until 2010, and held the title of "Senior Health and Science Advisor" to the USEPA Superfund Division, Region 5, for most of that time.  (Clark Environmental Counseling Report (hereinafter "Clark Report"), Ex. 12 to Pl.'s 56.1, at 7.)  With USEPA approval, Clark started a private environmental consulting business, Clark Environmental Consulting, in 2005; he currently serves as the enterprise's President and as an adjunct professor at the University of Illinois School of Public Health.  (Clark Report at 6, 7; Clark Dep. 11:5-16 .)  In his 2011 report, Clark based his conclusions on both Bonestroo's and ETI's investigations, as well as on various federal and state agency guidelines and his own expertise as the co-author of USEPA Region 5 guidelines concerning vapor intrusion.  (Clark Report at 1.)  Clark ultimately concluded that an imminent and substantial threat to both human and environmental health exists because of the contamination.  (Clark Report at 1-3.)  In his deposition, he explained further that, in his opinion, even "trace amounts" of contamination can constitute an imminent threat.  (Clark Dep. 140:8-24.)

As noted, the parties have now filed cross-motions for summary judgment on FPNB's RCRA claims (Counts I &II).  FPNB has also moved for summary judgment on its CERCLA claims for reimbursement of response costs and for a declaratory judgment that Defendants will be responsible for necessary response costs in the future (Counts III & IV).

## DISCUSSION

The court will grant a motion for summary judgment if, construing all facts in the light most favorable to the non-moving party, *Sierra Club v. Franklin Cnty. Power of Illinois, LLC*, 546 F.3d 918, 930 (7th Cir. 2008), the moving party demonstrates that "there is no genuine dispute as to the any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Because both parties have moved for summary judgment on the RCRA claims, on those claims the court must adopt a Janus-like approach, meaning "[a]s to each motion

the nonmovant's version of any disputed facts must be credited." *Adkins v. Local 705 Int'l Bhd. of Teamsters Pension Fund*, 787 F. Supp. 2d 812, 814 (N.D. Ill. 2011).

## I.    Standing

Defendants first argue that FPNB's RCRA claims must be dismissed for lack of standing. To show standing, FPNB must establish: (1) a "concrete and particularized" injury-in-fact that may be either "actual or imminent"; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable decision will result in a remedy for the plaintiff. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Franklin Cnty. Power*, 546 F.3d at 924. Each element "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. In other words, when a defendant challenges standing at the summary judgment stage, the plaintiff cannot rest on mere allegations of injury resulting from the defendant's conduct, but must actually demonstrate "a factual showing of perceptible harm." *Id*. at 561-62, 566. Defendants here challenge the first prong, asserting that FPNB has failed to allege an injury-in-fact. Specifically, Defendants contend that FPNB's pleadings address only the contamination of other properties—not any contamination of 423 Ashland—and that FPNB has marshaled no evidence sufficient to show an actual or imminent harm. (Defs.' Reply Mem. in Supp. of Their Mot. for Partial Summ. J. [111] at 1-6.)

Defendants' argument, however, inaccurately characterizes the evidence set forth by FPNB and conflates a claim of harm sufficient to support standing with proof of harm sufficient to prevail on the merits. The purpose of the standing inquiry is not to determine whether Defendants have violated RCRA, but rather to determine whether FPNB has asserted "reasonable concerns" about an injury or injuries resulting from Defendants' conduct. *Covington v. Jefferson Cnty.*, 358 F.3d 626, 639 (9th Cir. 2004) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000)). FPNB seeks "to redress current and threatened injury" to

16

itself and to property it owns at 423 Ashland. (Pl.'s Reply to Defs.' Mem. in Resp. to Pl.'s Mot. for Partial Summ. J. (hereinafter "Pl.'s Reply") [112] at 3.) The most obvious evidence that FPNB suffers "current" injury is the 2009 ETI Report showing perc contamination on the 423 Ashland property at 33 ppm near the border with RFC and at .26 ppm at the borehole closest to the residence located on the property. (Pl.'s Reply at 3; ETI Report at 8.) Whether this level of perc contamination results from an ongoing RCRA violation or creates an imminent and substantial threat to human health or environment is immaterial for purposes of the standing inquiry; the unauthorized physical presence of perc on FPNB's property, by itself, constitutes a trespass to property and thus suffices for the purposes of standing. *See, e.g.*, *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (explaining that environmental claims may stem from a variety of different injuries, from the more traditional tortious injury to a person or trespass on property to the less traditional diminution in aesthetic and recreational value of an area). Even a small amount of perc on FPNB's property establishes the required injury for standing purposes. *See, e.g.*, *Am. Bottom Conservancy v. U.S. Army Corps of Engineers*, 650 F.3d 652, 656 (7th Cir. 2011) (citing *Laidlaw Envtl. Servs.*, 528 U.S. at 183 (2000)) ("The magnitude, as distinct from the directness, of the injury is not critical to the concerns that underlie the requirement of standing . . . ."); *see also Franklin Cnty. Power*, 546 F.3d at 925 (stating that the injury-in-fact "need not be large, an identifiable trifle will suffice") (quotation marks and citations omitted).

Moreover, the physical presence of contamination on FPNB's property is not the only injury claimed and reasonably supported by the evidence before the court. An FPNB representative, John Vainisi, stated at his deposition that FPNB has struggled to sell the 423 Ashland property, in part, because of the environmental issues. Defendants respond that FPNB has offered no tangible evidence in support of this assertion; as they point out, FPNB has not offered appraisals reflecting a decline in value of the property nor any proof that negotiations have faltered or offers withdrawn

because of the contamination. But Defendants do not dispute that their own property is contaminated with hazardous materials—up to 14,000 ppm a few yards from the border with FPNB's property—and that the contamination was widely publicized in local papers; it does not require "an ingenious academic exercise in the conceivable" to infer a diminution in property value may result from those facts. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688 (1973). When Edward Ditchfield initiated settlement negotiations with the USEPA over response costs owed, he stated that "due to the real or inflated environmental stigma associated with the [perc] contamination," he faced the prospect of losing tenants at his commercial properties. (Oct. 15, 2010 Letter at 4.) Construing the facts in a light most favorable to FPNB, it is easy to infer damage to property value based on significant perc contamination on an adjacent property, as well. *See, e.g.*, *Laidlaw Envtl. Servs.*, 528 U.S. at 182-83 (finding organizational standing based, in part, on one member's testimony that she believed contamination from the defendant's nearby wastewater treatment plant lowered her property value). Common sense dictates that the contamination would deter potential buyers of the residential property at 423 Ashland as well, particularly when, as FPNB notes, a federal public health agency has recommended that "the property should not be occupied until a characterization of the subsurface contamination and further indoor air testing be conducted." (ATSDR Report at 4.)

FPNB has also proffered sufficient evidence that it may suffer future harm should the perc plume beneath RFC continue to spread onto its property. As stated, a legitimate injury for standing purposes may be "actual or imminent." *Lujan*, 504 U.S. at 560-61. "[T]he fact that a loss or other harm on which a suit is based is probabilistic rather than certain does not defeat standing." *Am. Bottom Conservancy*, 650 F.3d at 658 (citation omitted). In *American Bottom Conservancy*, the Seventh Circuit found standing where three members of the plaintiff environmental organization submitted affidavits stating that their enjoyment of a state park would be diminished if the defendant were allowed to fill in 18 acres of wetlands half a mile from the park for the construction

of a waste disposal facility. 650 F.3d at 657. The affiants stated, without further substantiation, that the planned construction would destroy much of the bird and butterfly populations that reside in the wetlands but fly over the state park. *Id*. at 657-58. Judge Posner, writing for the court, rejected the lower court's finding that any reduction in wildlife was "merely speculative" and found that the resulting "probable injury" to the members' enjoyment of the state park was sufficient to establish standing. *Id*. at 658, 659.

The threatened injury claimed by FPNB, by contrast, is far less attenuated or theoretical: FPNB owns a residential property immediately adjacent to Defendants' property, which is indisputably contaminated with hazardous materials such that the USEPA investigated the property and ordered remedial measures for other nearby commercial facilities. Should the contamination underneath RFC continue to spread, FPNB could suffer further decreased value of its property and heightened threats to the health of any employees that inspect, clean, or show the property in an effort to sell it. Indeed, "risks from improper operation of a [source of contamination] are in no way speculative when the [source of contamination] is your next-door neighbor." *Covington*, 358 F.3d at 638 (finding injury-in-fact sufficient to establish standing where plaintiff homeowners claimed damage to their property and a threat to their health based on RCRA violations by a landfill located across the street from them). For these reasons, the court finds FPNB has sufficiently established standing to proceed on its RCRA claims.

**II.     Plaintiff's "in violation of" claim under § 6972(a)(1)(A) of RCRA (Count I)**

Both parties seek summary judgment on the merits of FPNB's § 6972(a)(1)(A) claim under RCRA, which authorizes a citizen suit "against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter . . . ." 42 U.S.C. § 6972(a)(1)(A). FPNB asserts two different violations it claims are "continuing": (1) the current physical presence of contamination on FPNB's

property and (2) Defendants' failure to abide by various RCRA regulations as enacted and enforced by Illinois. As explained below, the court grants Defendants' motion for summary judgment on Count I to the extent that claim is based on the current physical presence of contamination. The court concludes, however, that a question of material fact exists regarding Defendants' violations of Illinois hazardous waste regulations, and, accordingly, it denies both parties' motions on Count I regarding that aspect of the claim.

A.       **Current Physical Presence of Contamination**

Whether Defendants can be deemed to be "in violation of" RCRA based solely on the continued presence of illegally emitted perc at the Site presents a tricky issue. There is no doubt that the "in violation of" language precludes claims based on "wholly past violations." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60-61 (1987) (interpreting the citizen suit provision in the Clean Water Act but noting that identical language in RCRA means that citizen suits are limited to prospective relief); *see also Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1315 (2d Cir. 1993) ("The Supreme Court acknowledged [in *Gwaltney*] that the language in the citizen suit provisions of the Clean Water Act and § [6972](a)(1)(A) of RCRA is identical, yielding the same requirement that plaintiff allege an ongoing or intermittent violation of the relevant statute.").

That Plaintiff here is limited to prospective relief thus appears clear. What is less obvious is how the term "wholly past violations" is properly defined. In *Gwaltney*, the defendant repeatedly violated its permit conditions regarding effluent emissions; its last emission exceedance occurred in May 1984, and plaintiff filed suit in June 1984. 484 U.S. at 53-54. The Court found this factual basis insufficient to demonstrate that the defendant was "in violation of" the permit for several reasons. First, it stated that "[t]he most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable

likelihood that a past polluter will continue to pollute in the future." *Id*. at 57. Second, the court found the "pervasive use of the present tense" throughout the citizen-suit provision demonstrative of its "forward-looking" nature. *Id*. at 59. Finally, the Court described the citizen-suit provision as designed to "supplement rather than to supplant government action," and observed that, were "in violation of" claims allowed for past violations, individuals could undermine agency authority by seeking damages for past violations that the agency intentionally chose not to pursue as part of a larger agreement with the offender. *Id*. at 60-61.

Post-*Gwaltney*, the debate among the lower courts has centered on how to distinguish a "wholly past violation" from a "continuous or intermittent violation." Many courts have noted the unique difficulty of differentiating past from ongoing violations, particularly "where the conduct that gave rise to the violation has ceased, but the *effects* continue." *See, e.g.*, *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1139 (10th Cir. 2005) (emphasis in original). This is exactly the issue the parties dispute here: whether the continued presence of perc contamination constitutes a continuous violation even after Defendants have curbed all conduct resulting in illegal emissions.[16] Some district courts have held that the continued presence or migration of pollutants can constitute a continuous violation under § 6972 (a)(1) (A), even after the defendant no longer emits pollutants. *See, e.g.*, *Aurora Nat'l Bank v. Tri Star Marketing, Inc.*, 990 F. Supp. 1020, 1024-25 (N.D. Ill. 1998) (" . . . the continued presence of illegally dumped materials generally constitutes a 'continuing violation' of the RCRA, which is cognizable under § 6972(a)(1)(A)") (quoting *Acme Printing Ink Co. v. Menard, Inc.*, 891 F. Supp. 1289, 1301-02 (E.D. Wis. 1995)); *Umatilla Waterquality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc.*, 962 F. Supp 1312, 1322 (D. Or.

---

[16] As Defendants note, FPNB does not attempt to allege that Defendants illegally emit or release perc in the course of the current operation of RFC. (Defs.' Reply at 9-10.) Though its pleadings may not expressly say as much, FPNB's overall theory of contamination appears to be that all illegal emissions occurred before 1992, when Defendants switched from the "transfer unit" to the "dry-to-dry unit."

1997) ("[A] discharge of pollutants is ongoing if the pollutants continue to reach navigable waters, even if the discharger is no longer adding pollutants to the point source itself.").

It does not appear that any Court of Appeals has adopted this approach, however. Instead, at least two Courts of Appeals have held that where the defendant no longer actively emits pollutants, a plaintiff cannot bring an "in violation of" claim under § 6972(a)(1)(A) based solely on the continued presence of the pollutants. *See, e.g.*, *Conn. Coastal Fishermen*, 989 F.2d at 1315 (finding no continuing violation under § 6972(a)(1)(A) because defendant skeet shooting club permanently closed the range, even though its operation deposited over 5 million tons of lead in Long Island Sound over the course of 70 years); *Chemical Weapons Working Group, Inc. v. U.S. Dep't of Defense*, 61 Fed. Appx. 556, 559-60 (10th Cir. 2003) (finding all alleged violations were "wholly past" where they occurred prior to the filing of the final amended complaint and where defendants' response to emissions and subsequent improvement of facilities was not triggered by litigation).

Though the Seventh Circuit has not yet weighed in on the matter, several other courts in this district have, and their opinions are informative. Defendants rely heavily on *Harris Bank Hinsdale, N.A. v. Suburban Lawn, Inc.*, No. 92 C 6814, 1992 WL 396294 (N.D. Ill. 1992) (Conlon, J.) in support of their assertion that an uncorrected emission of hazardous material cannot constitute an ongoing violation under § 6972(a)(1)(A). In that case, the plaintiff bank acquired a property from the defendant corporation which had owned and operated four underground storage tanks ("USTs") located on the property. When the bank detected "substantial gasoline contamination," it filed suit, claiming an ongoing RCRA violation based on the defendant's failure to remediate the spill. *Harris Bank Hinsdale*, 1992 WL 396295 at *1. The court found no evidence of an ongoing or intermittent violation and noted, as further confirmation of its finding, that the plaintiff's allegations were all stated in the past tense. *Id.* at *2.

FPNB attempts to distinguish *Harris Bank Hinsdale* on the ground that the defendant in that

22

case no longer owned or operated the USTs, but it is not clear how that sidestep bolsters their argument. (Pl.'s Resp. Mem. Opposing Defs.' Mot. for Partial Summ. J. (hereinafter "Pl.'s Resp.") [107] at 7.) The *Harris Bank Hinsdale* Court did rely, in part, on the fact that "the allegations [under §6972(a)(1)(A)] are violations of duties that apply only to owners or operators of [USTs]," and the defendant was no longer either. *Id*. at *2. But even in a very similar case where the defendant *did* still own and operate the USTs, the court only upheld the § 6972(a)(1)(A) claim because of facts not present here: in *Dydio v. Hesston Corporation*, the court found the plaintiff's § 6972(a)(1)(A) claim viable based on the continuous violation of regulations that required operators of USTs to take corrective action when faced with a known spill. 887 F. Supp 1037, 1044-45 (N.D. Ill. 1995) (Castillo, J.). In other words, the § 6972(a)(1)(A) claim survived a motion to dismiss because the plaintiff claimed violations of federal regulations requiring certain "release response and corrective action" for USTs containing petroleum. The "ongoing violation" was not based on the continuing physical presence of contamination, but rather, on the violation of a regulation requiring the response to and correction of an illegal release from a UST.

FPNB has not alleged a violation of a specific Illinois regulation requiring an affirmative response to and remediation of a perc release. Had it made such a showing, its "in violation of" claim would stand on firmer ground. Instead, FPNB states simply that the Site "has been contaminated by [D]efendants' own RCRA disposal violations" and asserts that those violations "are continuing until they clean up the hazardous wastes illegally disposed of on their property." (Pl.'s Resp. at 7.) Unlike the plaintiff in *Dydio*, FPNB bases its § 6972(a)(1)(A) claim on the initial violation that occurred when the pollutants were illegally emitted, and the subsequent contamination that remains on the property, rather than on an ongoing violation of any regulations requiring a response to that illegal emission.

Though *Gwaltney* did not (and perhaps could not) contemplate or articulate an exhaustive definition of a "wholly past" violation, it does include some helpful language. As quoted above, the

23

Court defined "continuous or intermittent" as "a reasonable likelihood that *a past polluter* will continue to pollute in the future." *Gwaltney*, 484 U.S. at 57 (emphasis added). According to the Court, the relevant inquiry is whether the defendant will engage in further conduct violating the law; the focus is on the offending actor rather than on the offense. Given this language, imposing liability under § 6972(a)(1)(A) where a defendant has indisputably terminated the violating conduct appears inconsistent with Supreme Court precedent.

The court offers one final observation on this issue. Interpreting § 6972(a)(1)(A) to preclude claims "where the violation has ceased, but the effects continue" does not mean there is no recourse for past violations. As originally enacted, RCRA's citizen-suit provision did not expressly encompass past violations, but in 1984, Congress amended RCRA with the Hazardous and Solid Waste Amendments, Pub.L. No. 98-616, 98 Stat. 3221 (1984). These amendments added § 6972(a)(1)(B), which allows a citizen-plaintiff to sue a past owner or operator that "contributed to" the handling of hazardous waste that "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). This history further bolsters the court's interpretation of subsection (a)(1)(A) for two reasons. First, subsection (a)(1)(B) would be entirely superfluous if subsection (a)(1)(A) allowed citizen-suits for any uncorrected past violation. Second, Congress's deliberate decision to make past violators liable only for those violations deemed imminently and substantially threatening is also informative; FPNB's interpretation of subsection (a)(1)(A) as creating liability for past conduct would make every and any illegal emission actionable, even of a *de minimis* amount of pollutant that poses no genuine threat. Such an approach could divert resources from truly threatening violations and allow any individual to supplant agency enforcement determinations. Read broadly, FPNB's interpretation would create a zero-tolerance policy that would open any one-time violator to liability by an over-zealous plaintiff, even where the single emission poses no danger. That cannot be what Congress, or the *Gwaltney* Court, intended. Because § 6972(a)(1)(A) does not provide remedies for "wholly past violations,"

the court grants summary judgment for Defendants on FPNB's "in violation of" claim to the extent that is based solely on the continued presence of perc at the Site.

### B.    Ongoing Violations of Illinois Regulations

FPNB does, however, assert a far more viable claim under § 6972(a)(1)(A) based on Defendants' continuous violations of Illinois regulations regarding the storage and disposal of hazardous waste. Since 1986, Illinois has administered the provisions of RCRA under the auspices of its state hazardous waste management program. *See* 40 CFR Part 721. Under these regulations, RFC is considered a RCRA "small quantity generator" of hazardous waste and is therefore potentially eligible for an exemption from the requirement that RFC obtain a RCRA storage permit or "interim status" (temporary authorization). 35 Ill. Admin. Code 722.134(d) (2011). But, FPNB contends, Defendants have not met all the minimum requirements for that exemption. Specifically, FPNB argues that Defendants have failed to affix "Hazardous Waste" labels, with the date the waste accumulation began, to the drums where they store hazardous waste, as required by 35 Ill. Admin. Code 722.134(d)(4), and that the failure to meet this minimum requirement means Defendants should have obtained a RCRA storage permit or sought "interim status" (temporary authorization). Since Defendants have done neither, FPNB argues, Defendants currently operate RFC "in violation of" RCRA.

FPNB alleges other regulatory infractions that, it argues, also constitute ongoing RCRA violations. Specifically, FPNB claims Defendants are "in violation of" regulations requiring them to: (1) maintain records of the removal of the drums of waste, as required by 35 Ill. Admin. Code 722.140(a); (2) submit annual hazardous waste reports to the IEPA, as required by 35 Ill. Admin. Code 722.141(a); (3) draft and maintain a "written closure plan" describing procedures for "partial or final closure of [RFC] at any point during its active life," as required by 35 Ill. Admin. Code 725.212; and (4) operate RFC in a manner designed to minimize unplanned

releases of hazardous waste, as required by 35 Ill. Admin. Code 725.131. According to FPNB, Defendants' failure to comply with all these regulations is sufficient to support its "in violation of" claim under § 6972(a)(1)(A).

Defendants counter that they have been "in compliance with the applicable regulations since at least 2002." (Defs.' Mem. in Resp. to Pl.'s Mot. for Partial Summ. J. (hereinafter "Defs.' Resp.") [106] at 5.) In his Rule 30(b)(6) deposition on behalf of E&H, current E&H president and RFC manager, Mkhitar Misakian, stated that he keeps the hazardous waste drums on a stand near the back of the store; Misakian stated that both the stand and the location are EPA-approved. (Misakian Dep., Ex. 10 to Pl.'s 56.1, 27:1-13.) Misakian maintains a compliance calendar where he records his weekly equipment inspections. (Misakian Dep. 27:8-21.) He acknowledged that he has not submitted any annual reports, but explained that "nobody never [sic] asked" for them. (Misakian Dep. 27:22-28:3.) Nor did he label his waste drums with the date upon which he initiated the waste accumulation. (Misakian Dep. 24:19-25:1.) He also stated that he did not have any records tracking the removal of hazardous waste drums. (Misakian Dep. 16:21-17:5.) There does not appear to have been any discussion of a closure plan at the deposition.

Misakian did not explain these apparent violations, and, in their submissions, Defendants insist that they are in full compliance with all hazardous waste requirements of the Illinois Drycleaner Environmental Response Trust Fund ("Trust Fund"). (Defs.' Resp. at 5-6.) Established in 1997, the Trust Fund issues licenses for dry cleaning facilities in Illinois. 35 Ill. Admin. Code 1500.10 et al. Trust Fund inspectors last evaluated RFC on January 17, 2011. (Misakian Dep. 38:5-11.) At that time, the inspector asked Misakian to address several minor housekeeping matters, such as obtaining a secondary tank for collecting evaporated water from the "dry-to-dry" machine and removing a piece of plywood that Misakian had used as a shelf. (Misakian Dep. 39:9-40:5. Misakian testified that he made the requisite changes and submitted photographs demonstrating those changes to the inspector; in a letter dated April 8, 2011, the

inspector confirmed that all deficiencies has been resolved and RFC was in full compliance with the Trust Fund's standards. (Misakian Dep. 39:9-40:9.; Apr. 8, 2011 Letter from Trust Fund, Ex. D to Defs.' Resp, at 1.) Defendants have also submitted, as further proof of their compliance with Illinois regulations, copies of their licenses from 2005 through 2011. (*See* Illinois Drycleaner Environmental Response Trust Fund Licenses, Ex. C to Defs.' Resp.)

It is not clear whether the Trust Fund checks for compliance with RCRA provisions, as administered by the IEPA, but the court presumes that state regulators would not have licensed and re-licensed a dry cleaning operation over many years if its hazardous waste procedures fell short of what the IEPA requires. The court finds that both parties have demonstrated a question of material fact exists as to Defendants' compliance with various Illinois hazardous waste provisions. To the extent, however, that FPNB alleges a claim based on Defendants' violation of 35 Ill. Admin. Code 725.131, which requires operation of a dry cleaning business in a manner designed to minimize unplanned releases of hazardous waste, the court rejects that claim; FPNB has presented no evidence that Defendants currently operate RFC in a manner not designed to minimize hazardous waste risks. Indeed, FPNB's own assertion of this claim occurs in the past tense. (Pl.'s Mem. in Supp. of Its Mot. for Partial Summ. J. (hereinafter "Pl.'s Mem.") [95] at 6) ("Defendants have not maintained and operated their facility . . ."). Therefore, FPNB's § 6972(a)(1)(A) claim (Count I) survives summary judgment only insofar as it is based on Defendants' alleged violation of Illinois regulations requiring them to properly label drums, maintain hazardous waste manifests, submit annual reports, and develop a written closure plan, as described above. The court adds that if FPNB is successful on this claim, the extent of the remedy available to them is not obvious; it is not clear that proving the aforementioned regulatory infractions would result in a court order requiring Defendants to undertake full-scale remedial measures at 423 Ashland.

III.     Plaintiff's "imminent and substantial endangerment" claim under § 6972(a)(1)(B) of RCRA (Count II)

Both parties have also moved for summary judgment on Count II, FPNB's claim under

42 U.S.C. § 6972(a)(1)(B). Under that subsection, a citizen may file suit

> against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . ."

42 U.S.C. § 6972(a)(1)(B). As noted above, this subsection was added to RCRA by Congress in

1984 to create a basis for citizen-suits against past RCRA violators where the violations were so

egregious that their effects continued to pose a serious threat to human and environmental health.

For the reasons explained below, the court denies Defendants' summary judgment motion to the

extent that Defendants have challenged this court's jurisdiction under CERCLA § 113(h), and

grants Plaintiff's summary judgment motion with respect to its assertion that Defendants

"contributed to" the mishandling of hazardous waste as required by RCRA § 6972(a)(1)(B). But

the court finds a question of material fact exists as to the nature and extent of the threat posed by

the contamination, and, accordingly, denies both parties' motions on that aspect of Count II.

A.     Does CERCLA § 113(h) Bar This Claim?

As a preliminary matter, the court must determine whether CERCLA bars the court from

entertaining this claim based on a settlement agreement that Edward Ditchfield entered into with

the USEPA. Defendants argue that the jurisdictional bar in CERCLA § 113(h), 42 U.S.C. 9613(h),

prevents the court from adjudicating this "endangerment" claim. In a subsection entitled "Timing

of Review," § 113(h) establishes that "[n]o Federal court shall have jurisdiction under Federal law

. . . to review any challenges to removal or remedial action selected under [CERCLA § 104], or to

review any order issued under [CERCLA § 106(a)] . . . ." 42 U.S.C. § 9613(h). As Defendants

state, the Settlement Agreement was entered pursuant to CERCLA § 122, 42 U.S.C. § 9622, which authorizes the [US]EPA to enter into settlement agreements with parties deemed responsible parties under CERCLA § 107, 42 U.S.C. § 9607; the Settlement Agreement settled Edward Ditchfield's liability for response costs that the USEPA incurred at the Site pursuant to CERCLA § 104, 42 U.S.C. § 9604.[17] (Defs.' Mem. in Supp. of Their Mot. for Partial Summ. J. (hereinafter "Defs.' Mem.") [91] at 4.; see also Settlement Agreement ¶¶ 1, 4, 6.) But the Settlement Agreement itself does not require that Defendants take any action pursuant to CERCLA § 104 or § 106.

At first glance, the plain language of the statute and of the Settlement Agreement seem to undermine Defendants' jurisdictional bar argument: the statute withdraws jurisdiction for challenges to action under CERCLA § 104 or orders under CERCLA § 106, but the Settlement Agreement here was created pursuant to CERCLA § 122, and refers to Edward Ditchfield as a "Settling Party" pursuant to CERCLA § 107. In other words, the Settlement Agreement does not, on its face, prescribe any action pursuant to § 104 or constitute an order entered under § 106, so it would seem that § 113(h) does not apply. But as Defendants argue, the "Background" section of the Settlement Agreement states that the USEPA "undertook response actions at the Site pursuant to [CERCLA § 104]" and that, after the ATSDR recommended installation of vapor mitigation systems at Annie's and My Gym based on the USEPA's testing results, Defendants "voluntarily undertook" those actions. (Settlement Agreement ¶ 4.) Defendants argue that their response constitutes

---

[17] The parties dispute whether the agreement should be referred to as a "settlement agreement" or an "administrative order on consent." As Defendants observe, the USEPA lawyer that sent the Agreement referred to it as an "Administrative Order on Consent" in the cover letter. (Dec. 29, 2011 Letter preceding Settlement Agreement, Ex. G to Defs.' Mem.) The document itself is titled "Settlement Agreement for Recovery of Past Response Costs," but it also states that "[t]he parties agree that this Settlement Agreement constitutes an administrative settlement . . ." (Settlement Agreement ¶ 28.) The court will refer to it here as a "settlement agreement," and notes, further, that it is not apparent that the title of the document matters nearly as much as the statutes pursuant to which it was entered; that is the question that will determine whether FPNB's "endangerment" claim is barred.

"removal or remedial action selected under [CERCLA § 104]" and that FPNB's "endangerment" claim constitutes a "challenge" to a USEPA-sanctioned action which should be barred by § 113(h).

Defendants proffer little case law in support of this assertion, however. They rely most heavily on *River Village West LLC v. Peoples Gas Light and Coke Co.*, in which the district court dismissed a RCRA "endangerment" claim when, after the suit was filed, the defendant entered into an administrative order on consent ("AOC") with the USEPA, pursuant to CERCLA § 106. 618 F. Supp. 2d 847, 854 (N.D. Ill. 2008) (Andersen, J.). Under the AOC, the defendant agreed to implement removal actions at eleven sites, including the eight sites which were the subject of the plaintiffs' suit. *Id*. at 850. But in dismissing the "endangerment" claim, the court relied on two facts that distinguish *River Village West* from this case. First, the court emphasized that "§ 113(h) clearly states that no federal court will have jurisdiction to review *any* AOC issued pursuant to § 106(a) of CERCLA," and, since the defendant's AOC was in fact entered into pursuant to that section, "[a]llowing the present litigation to go forward would be a violation of § 113(h) . . . ." *Id*. at 854. Here, there is no doubt that Defendants' Settlement Agreement was not entered into pursuant to CERCLA § 106.

Second, the *River Village West* court stated that the impending litigation necessarily interfered with the AOC because the eight sites that served as the basis for the suit were all addressed in the AOC; the plaintiffs were "essentially asking [the] court to impose the same requirements the EPA has already initiated." 618 F. Supp. 2d at 854. Thus, the litigation posed a "challenge" to the AOC. *Id*. The same cannot be said in this case. In the Settlement Agreement at issue here, Edward Ditchfield agreed to reimburse the EPA for "Past Response Costs," which the Settlement Agreement defines as "direct and indirect costs, that EPA or the U.S. Department of Justice on behalf of EPA has paid at or in connection with the Site through April 30, 2011, plus accrued [i]nterest . . . ." (Settlement Agreement ¶ 10.) Certainly a portion of those response costs includes costs expended to investigate possible perc contamination at 423 Ashland. (*See, e.g.*,

ATSDR Report at 1, 3) (evaluating USEPA sampling results from 423 Ashland, among other properties). Still, as Defendants themselves observe, samples taken at 423 Ashland yielded inconclusive results. The ATSDR Report, interpreting the USEPA's test samples, stated that "[s]ince the building is currently vacant, there is no completed exposure pathway" and recommended, further, that "the property should not be occupied until a characterization of the subsurface contamination and further indoor testing be conducted." (ATSDR Report at 3.)

As far as the court can tell, those inconclusive findings are the USEPA's only involvement with the contamination at 423 Ashland; the full extent of the contamination at 423 Ashland has not yet been determined. The USEPA did encourage Edward Ditchfield, as a potentially responsible party, to perform certain "response activities" it deemed necessary at Annie's and at My Gym, *i.e.*, the installation of the vapor mitigation systems (General Notice at 1-2.), but the fact that it did not recommend any similar "response activities" for 423 Ashland does not require the conclusion that a similar response is unwarranted. The investigation of and response to the contamination at Annie's is informative: initial sub-slab testing at Annie's in late February 2010 showed no hazardous waste exceedances, but indoor air sampling conducted the following month (at the request of the proprietor of Annie's) showed perc exceedances that ultimately necessitated the installation of the vapor mitigation system at Annie's. (ATSDR Report at 3.) At 423 Ashland, sub-slab testing conducted at the same time *did* show an exceedance for methylene chloride,[18] but as explained, no indoor air testing has been conducted yet. The testing conducted at Annie's demonstrates that it is possible for indoor air samples to register threatening exceedances even where sub-slab

---

[18] The court presumes that, if the USEPA did not order, or encourage Edward Ditchfield to undertake, a response to the sub-slab exceedance detected at 423 Ashland in February 2010, the exceedance, by itself, must not have presented a "an imminent and substantial endangerment" at the time. That said, the court also does not read the USEPA's inaction regarding 423 Ashland as a tacit endorsement of the environmental health of the property; the ATSDR Report unambiguously recommends further testing be done at 423 Ashland in order to more thoroughly characterize the contamination.

samples do not. In other words, it remains possible that the property at 423 Ashland may require future response actions heretofore unaddressed by the USEPA. Thus, FPNB's suit here does not interfere with or "challenge" any USEPA action vis-à-vis 423 Ashland. FPNB seeks to pick up where the USEPA left off—it seeks to ascertain the full extent of the contamination and to obtain redress for an alleged "imminent and substantial endangerment."[19]

Defendants state that "[r]esponse actions at the Site are currently ongoing, and will continue for an indefinite period of time," presumably to underscore their assertion that this litigation challenges or interferes with USEPA action. In support of this argument, Defendants reference only the follow-up sampling of the vapor mitigation systems installed at Annie's and at My Gym (*see* Defs.' Mem at 5-6); there is no evidence that the USEPA, or Defendants, intend to conduct any future testing at 423 Ashland. ATSDR has announced that the residence at 423 Ashland "should not be occupied until there is further site characterization" but did not present or prescribe any concrete plan designating who will conduct future testing or at what time. "[T]he statutory purpose of section 113(h) . . . [is] to ensure that, once the EPA chooses a removal or remedial action for a particular site, litigation will not delay the completion or enforcement of a cleanup action."

---

[19] Neither of the parties address the apparent "Catch 22" at the heart of ascertaining the extent of the contamination present at 423 Ashland. The ATSDR Report noted that since the residence was unoccupied, there was "no completed exposure pathway" for testing vapor intrusion. (ATSDR Report at 3.) Yet ATSDR also recommended that the residence not be occupied until further vapor intrusion testing can be done. (ATSDR Report at 3, 4.) Similarly, FPNB's expert testified at his deposition that

> [i]f the house is unoccupied, it wouldn't be prudent to take [indoor air samples] now. The house has to be at a proper temperature, air conditioning, furnace, whatever operating for a period of time. So you have to bring the house—the windows have to be closed up in the normal way of doing this type of sampling. So if that isn't available readily, then there is not much point in doing it until the house is getting ready to be occupied.

(Clark Dep. 123:9-18.) In other words, the house cannot be occupied until further indoor air sampling is conducted, but further indoor air sampling cannot be conducted until the house is occupied or "getting ready to be occupied." Thus, it remains unclear how either party would investigate the full extent of the contamination at 423 Ashland.

*Vill. of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 784-85 (7th Cir. 2008). There is no evidence that this litigation is delaying or will delay the completion of an ongoing cleanup action. To the contrary, the evidence suggests that FPNB's suit seeks to jumpstart a nonexistent cleanup action. In that sense, this RCRA citizen-suit serves the very gap-filling purpose for which the citizen-suit provision was designed. *See, e.g.*, *Adkins*, 644 F.3d at 486 (noting that the citizen-suit provision exists because "RCRA does not give sole responsibility to federal and state environmental agencies and assume that they will enforce the law adequately").

In comparison, another case frequently cited by Defendants better illustrates the sort of litigation that does present a "challenge" to EPA action. In *North Shore Gas Co. v. EPA*, the Seventh Circuit described § 113(h) as "a blunt withdrawal of federal jurisdiction" applicable to the plaintiff's RCRA and the National Environmental Policy Act claims and, accordingly, dismissed the claims. 930 F.2d 1239, 1244 (7th Cir. 1991). The plaintiff in that case, however, was suing to enjoin the construction of a boat slip, pursuant to a remedial plan and consent decree between the USEPA and a third-party, because the plaintiff believed the construction would increase the cost of responding to its own contamination. *Id.* at 1243. An injunction to prevent the execution of an express requirement of a remediation plan is the quintessential "challenge" contemplated by § 113(h) and is easily distinguishable from the relief that FPNB seeks in light of the USEPA's relative inaction with respect to 423 Ashland.

`The court concludes that § 113(h) does not bar FPNB's "endangerment" claim under § 6972(a)(1)(B) and denies Defendants' motion for summary judgment on that basis.

**B.    "Imminent and Substantial Endangerment"**

As noted, both parties seek summary judgment on FPNB's "endangerment" claim. To establish liability under § 6972(a)(1)(B), FPNB must prove: "(1) that the defendant has generated solid or hazardous waste, (2) that the defendant is contributing or has contributed to the handling

of this waste, and (3) that this waste may present an imminent and substantial danger to health or the environment." *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 972 (7th Cir. 2002). FPNB argues that the evidence supports this claim, but Defendants disagree; they argue that FPNB has presented no evidence regarding the second and third prongs.[20] For the following reasons, the court finds remaining issues of material fact regarding the nature of the threat posed by contamination at and near 423 Ashland, and therefore, it ultimately denies both parties' motions for summary judgment on Count II.

### 1. "Contributed to"

Defendants' first argument—that FPNB offers no evidence that Defendants have "contributed to" any contamination—borders on the frivolous. Defendants contend that FPNB must establish a "causal relationship between the leakage and the Defendants' activities" in order to prove they "contributed to" any contamination. (Defs.' Mem. at 9) (citing *Aurora Nat'l Bank*, 990 F. Supp. at 1028, 1030). "[T]he mere presence of contamination," they argue, is insufficient to meet FPNB's burden. (Defs.' Mem. at 9.) The Seventh Circuit has not yet expounded upon the definition of "contribute" in § 6972(a)(1)(B), but it did note that "[t]he ordinary meaning of 'contribute' is 'to act as a determining factor'" and that use of the word in RCRA "require[s] affirmative action." *Sycamore Indus. Park Assoc. v. Ericsson, Inc.*, 546 F.3d 847, 854 (7th Cir. 2008). This court agrees that a reasonable interpretation of "contribute" requires a causal connection between Defendants' conduct and the present contamination at the Site but rejects Defendants' contention that FPNB has not proffered any evidence of such a connection.

Substantial perc contamination is indisputably present on the Site where Defendants have operated a dry cleaning business—a business that necessarily requires the use of perc—for almost

---

[20] Defendants do not appear to challenge the "substantial" nature of any alleged endangerment. This is wise, as both parties' experts acknowledged that perc is a probable human carcinogen which, at a minimum, causes various toxic effects even if it does not directly cause cancer. (Bonestroo Dep. 53:14-55:3; Clark Dep. 89:8-92:1.)

35 years. Most notable about the operation of this dry cleaning business, FPNB asserts, is the drastic change in its perc consumption over the years, from which the court (or any factfinder) can draw reasonable inferences: from 1978 to 1992, Defendants used a "transfer unit" machine and purchased 100 gallons of perc per month, but after they switched to the "dry-to-dry unit" in 1992, they purchased only 50 gallons of perc per year—a 96 per cent reduction in perc consumption.[21] Since Defendants do not proffer any evidence of a commensurate decrease in hazardous waste removals, it is not unreasonable to infer that, during the use of the "transfer unit," considerable amounts of perc may have been improperly released or disposed of.

Nor is FPNB's evidence limited to the power of inference. Edward Ditchfield admitted that he sometimes disposed of used filtering agent in the municipal dumpster in the parking lot behind RFC near the property line with 423 Ashland, though he insists any perc residues would have been "minuscule." (E. Ditchfield's Dep. 121:6-14; *see also* Answer ¶¶ 14, 15.) He also estimated that "the very vast majority" of RFC's 100-gallon monthly perc supply, from 1978-1992, simply "evaporated into the air." (E. Ditchfield Dep. 73:11-75:19, 78:14-19.) Moreover, Bonestroo's Phase I Report stated that dry cleaning processes prior to installation of the "dry-to-dry" machine, "may pose a threat to soil and/or groundwater quality." (Phase I Report at 9.) Finally, when the USEPA named Edward Ditchfield as a potentially responsible party with respect to the contamination at the Site, and suggested he undertake response actions, Mr. Ditchfield obliged. By no means are his actions an express admission of liability, but there is no evidence Defendants have filed a contribution suit seeking partial or full reimbursement from any other potentially responsible party—an unexplained omission from which a factfinder could, again, draw reasonable inferences.

---

[21]     If Defendants purchased 100 gallons of perc monthly, they purchased 1200 gallons annually. A decrease from 1200 to 50 gallons purchased annually constitutes a reduction by 1150 gallons, *i.e.*, a 96 per cent reduction because 1150/1200 = .9583 or 96 per cent.

Defendants' failure to seek third-party contributions is particularly noteworthy in light of their theory that the prior owners of a dry cleaning business at the Site are responsible for the contamination, or at least, that FPNB has no proof that Defendants, rather than the prior owners, caused the contamination.[22] The Ditchfields both testified that local townspeople had told them that there had been a dry cleaning business at the Site since 1927 or 1928. (H. Ditchfield Dep. 26:21-27:12; E. Ditchfield Dep. 108:18-110:19.) Helen Ditchfield also testified that the previous owner, a man she said was named Al Saunders, told her the property had been a dry cleaning business since 1927. (H. Ditchfield Dep. 26:19-27:9.)[23] One of the reports by Bonestroo also stated that the Site had housed a dry cleaning business since the late 1920s, but Edward Ditchfield admitted that Bonestroo relied entirely on his word for that statement. (E. Ditchfield Dep. 110:9-19.) And, as FPNB noted, a chain-of-title review of the property provides no indication that a dry cleaning business ever existed there. (Pl.'s 56.1 ¶ 11.) Defendants offer no other evidence corroborating their assertion that RFC was a dry cleaning business since the 1920s.

The scant evidence provided by Defendants to suggest that a prior dry cleaning operator caused the perc contamination at the Site is simply insufficient at this stage in the litigation. By now, summary judgment is well-known as the "put up or shut up" moment in a lawsuit, when the nonmoving party must present evidence sufficient to convince a reasonable jury. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Defendants here offer no evidence, other than their own sworn testimony, from which a reasonable jury might find they did not at least

---

[22]     As explained earlier, some of Bonestroo's reports over the years have alluded to contamination resulting from storage tanks that were on the property when Defendants became the owners in 1978. (*See, e.g.*, Phase II Report at 9) (concluding that the plume was primarily caused by "releases" from the above-ground storage tank that used to be located outside RFC's rear door). Because Defendants make no mention of the tank in its argument here, and Edward Ditchfield's uncorroborated testimony is the only evidence in the record substantiating this theory, the court need not address it further.

[23]     Edward Ditchfield, on the other hand, stated that the previous owner was a woman. (E. Ditchfield Dep. 109:10-19.) There is no other evidence regarding the prior owner in the record.

"contribute[] to" the perc contamination at the Site during the 35 years of RFC's operation. Thus, the court grants FPNB's motion for summary judgment on the "endangerment" claim (Count II) to the extent that it turned on whether Defendants "contributed to" the perc contamination at issue here.

### 2. "Imminent and Substantial"

Defendants also argue for summary judgment on Count II based on FPNB's failure to demonstrate "an imminent and substantial endangerment to health or the environment" as required by § 6972(a)(1)(B). They insist that the mere presence of contamination is insufficient to establish an imminent endangerment and that any alleged threat to health or environment is entirely speculative. (Defs.' Mem. at 12-15.) Relying on Supreme Court precedent, *Meghrig v. KFC Western, Inc.*, Defendants argue that FPNB must show that "the risk of harm threatens to occur immediately." (Defs.' Mem. at 12.) Their reliance on *Meghrig* is misplaced. The *Meghrig* Court did state that an "imminent" endangerment must be one that "threaten[s] to occur immediately," 516 U.S. 479, 485 (1996) (internal quotation marks and citation omitted), but then it explained further:

> " . . . there must be a threat which is present *now*, although the impact of the threat may not be felt until later." It follows that § 6972(a) was designed to provide a remedy that ameliorates present or obviates the risk of future "imminent" harms, not a remedy that compensates for past cleanup efforts.

*Id*. at 486 (emphasis in original) (quoting *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)). In *Meghrig*, the plaintiff removed and disposed of contaminated soil and then sued the prior owners under § 6972(a)(1)(B); the court held that RCRA does not authorize citizen suits under § 6972(a)(1)(B) to recover past cleanup costs where the contamination no longer poses a threat to health or environment. 516 U.S. at 481-82. The claim in *Meghrig* to recover past response costs is easily distinguishable from FPNB's claim here, which is based on a *current* alleged endangerment and seeks to initiate cleanup efforts.

Also, to the extent FPNB's "endangerment" claim alleges a threat to health, Defendants contend it must fail because FPNB has not shown that any of the traditional "exposure pathways"—air, water, or soil—pose an imminent threat to humans: the residence is unoccupied, so no one breathes the air; a village ordinance prohibits consumption of groundwater; and the 423 Ashland property is largely covered in pavement, which creates a barrier from ground contamination, thereby making any potential contact with contaminated soil during construction work far too speculative. (Defs.' Mem. at 13-15.) But ultimately Defendants' argument misses the mark for two reasons. First, Defendants' interpretation of "imminent" is too narrow. "Imminence does not require an existing harm, only an ongoing threat of future harm." *Albany Bank & Trust*, 310 F.3d at 972 (citation omitted). "Imminence" generally requires a "near-term" threat of harm, but "there is no corollary requirement that the harm necessarily will occur or that the actual damage will manifest immediately." *Maine People's Alliance and Natural Resource Defense Council v. Mallinckrodt*, 471 F.3d 277, 288 (1st Cir. 2006). Whether the threat is "imminent" cannot turn on whether the allegedly contaminated residence is currently occupied; by that twisted rationale, the owner of any property rendered uninhabitable by extreme contamination could not bring a § 6972(a)(1)(B) claim based on an imminent threat to health.

Moreover, many courts have observed that other language selected by Congress for § 6972(a)(1)(B) countenances against a restrictive reading of the provision—namely use of the words "may" and "endangerment." As noted, § 6972(a)(1)(B) creates liability where a defendant "contributed to" the handling of hazardous waste "which *may* present an imminent and substantial endangerment." Though the Seventh Circuit has yet to comment on the significance of "may," several other circuits have construed § 6972(a)(1)(B) broadly, in large part, because of the use of the word "may." *See, e.g., Burlington Northern and Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1020 (10th Cir. 2007); *Mallinckrodt*, 471 F.3d at 288; *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 258-59 (3d Cir. 2005); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1015

(11th Cir. 2004). Similarly, many circuits have interpreted the "endangerment" requirement to entail only a potential harm, rather than an actual or realized harm. *See, e.g., Crandall v. City and Cnty. of Denver*, 594 F.3d 1231, 1237 (10th Cir. 2010); *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 211 (2d Cir. 2009); *Mallinckrodt*, 471 F.3d at 296. In the words of the First Circuit, "the use of the word 'may' with the word 'endanger,' both of which are highly probabilistic, leads us to conclude that a reasonable prospect of future harm is adequate to engage the gears of RCRA § [6972](a)(1)(B) so long as the threat is near-term and involves potentially serious harm." *Mallinckrodt*, 471 F.3d at 296.

The second reason that Defendants' "imminence" argument fails is that, as explained above, a thorough assessment of the contamination at 423 Ashland has yet to be conducted. FPNB has demonstrated that a significant perc plume exists beneath the Site, adjacent to its 423 Ashland property, and that at least some contamination had, by early 2010, begun to creep through the soil, across the property line shared with 423 Ashland. It is quite possible that air samples taken today, under appropriate test conditions, would reveal pollutant exceedances requiring installation of vapor mitigation systems like those installed at nearby Annie's and My Gym. In other words, a genuine dispute about a material fact—the extent of the contamination at 423 Ashland—remains unresolved. Thus, the court ultimately denies both parties' motions for summary judgment as to the "endangerment" claim under § 6972(a)(1)(B) (Count II).

**IV.    Plaintiff's Cost Recovery and Declaratory Judgment Claims Under CERCLA**

As a final bit of business, the court addresses FPNB's motion for summary judgment on its cost recovery and declaratory judgment claims under CERCLA, Counts III and IV, respectively. Congress enacted CERCLA to "provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and cleanup of inactive hazardous waste disposal sites." CERCLA, Pub. L. No. 96-510, 94 Stat. 2767 (1980). CERCLA

allows those responding to a hazardous waste release to bring private cost recovery actions against those responsible for the release. In order to recover response costs under CERCLA § 107, 42 U.S.C. 9607, a plaintiff must prove the following elements: "'(1) the site in question is a 'facility' as defined by CERCLA; (2) the defendant is a 'responsible person' for the spill as defined by CERCLA; (3) there was a release of hazardous substances; and (4) such release caused the Plaintiff to incur response costs.'" *Emergency Servs. Billing Corp. v. Allstate Ins. Co.*, 668 F.3d 459, 463 (7th Cir. 2012) (quoting *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992)). Additionally, a non-governmental plaintiff must show that any costs incurred in responding to the release were "necessary" and "consistent with the national contingency plan." 42 U.S.C. 9607(a)(4)(B); *G.J. Leasing Co., Inc. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th Cir. 1995).

Perhaps due to the complex nature of the RCRA claims and the inevitable constraints of page limits, the parties give short shrift to the CERCLA claims: one page in FPNB's memorandum, one page in Defendants' response, and half a page in FPNB's reply. (See Pl.'s Mem. at 14-15; Defs.' Resp. at 14-15; Pl.'s Reply at 15-16.) The only challenge Defendants make to the CERCLA claims[24] is that FPNB's investigation costs were not "necessary." (Defs.' Resp. at 14-15.) Defendants cite the Ninth Circuit for the notion that, before a party can initiate a response to a release of hazardous waste, "an actual and real threat to human health or the environment" must exist. (Defs.' Resp. at 14-15 (citing *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 867 (9th Cir. 2001).) They argue that no such threat exists here and therefore FPNB cannot recover under CERCLA § 107.

There is little Seventh Circuit case law regarding when response costs can be deemed

---

[24] In their limited treatment of the CERCLA claims, the parties do not distinguish between Count III, seeking reimbursement for costs incurred, and Count IV, seeking a declaratory judgment regarding future response costs.

"necessary" under CERCLA, though the court has recognized the importance of that statutory limitation. *See G.J. Leasing*, 54 F.3d at 386 (describing the "necessary" requirement as a useful deterrent that prevents plaintiffs from charging the expense of a property upgrade to defendants by undertaking significant costs to completely eliminate any contamination when more modest measures would make the site safe). But the Seventh Circuit has not held that "an actual and real threat to human health or the environment" must exist in order for a response cost to be deemed "necessary." Even if it had, however, it seems likely that a migrating plume of perc, a statutorily recognized hazardous substance, on a neighboring property would qualify as just such a threat.

Moreover, the statutory language of CERCLA supports FPNB's claim for reimbursement of its investigative costs. CERCLA's definition of "response" includes "removal" actions, 42 U.S.C. § 9601(25), and "removal" includes "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances . . . ." 42 U.S.C. § 9601(23). In this case, FPNB hired ETI to investigate the contamination at 423 Ashland shortly after the bank took control of the property, and paid ETI $5,639.86, for which it now seeks reimbursement. (Pl.'s 56.1 ¶ 65.) The court readily finds these modest investigative costs "necessary" to help determine the magnitude of the threat presented by the perc plume, particularly given the residential nature of the property. Similarly, other district courts have sustained CERCLA § 107 claims for reimbursement of investigative costs incurred in assessing a release of hazardous waste. *See, e.g., City of Gary v. Shafer*, 2009 WL 1605136 *15 (N.D. Ind. June 2, 2009); *Cont'l Title Co. v. Peoples Gas Light and Coke Co.*, 1999 WL 753933 *3 (N.D. Ill. Sept. 15, 1999) (citing cases). Defendants, moreover, have not put forth any reason why they should not be held liable for costs FPNB incurs in any future response actions "necessary" at 423 Ashland. Therefore, the court grants summary judgment for FPNB on its CERCLA cost recovery claim (Count III) and on its declaratory judgment claim establishing Defendants' liability for future response costs in connection with 423 Ashland (Count IV).

## CONCLUSION

The parties' motions for summary judgment are granted in part and denied in part, in accordance with this opinion.  Ultimately, the court grants summary judgment for FPNB on its CERCLA claims, but both RCRA claims remain for trial, at least in part.

ENTER:

Dated:  July 24, 2012

REBECCA R. PALLMEYER
United States District Judge



**Appendix A**